Mr. Lamkin. Thank you. It may please the Court. I'd like to begin with the Seventh Amendment and the jurisdictional issues. Erickson was denied its Seventh Amendment jury trial right on three independent, in three independent ways. The actual relief granted was legal relief, retroactive monetary compensation for past wrongs. Second, the trial court resolved issues that were common to both legal and equitable claims in a bench trial, which is something you cannot do under Beacon Theaters. And finally, the declaratory judgment action that the district court tried was actually just an inverted patent infringement suit brought by the would-be infringer, as TCL repeatedly represented to the court and the court found when it established jurisdiction. Do you agree that you could waive your right to a jury trial? Yes. So Rule 39 provides a mechanism for waiving it, and it's by stipulation. But the district court didn't find that we waived our right to a jury trial. It didn't find that there was any way that we agreed to a bench trial. And that would be very hard to The procedural posture of this is really complicated, though. And it does seem, at certain points, you suggested to the district court that certain issues were appropriate for the judge to resolve rather than a jury. And those issues ended up being intertwined with the things that you're now saying you had a jury right to. So can you explain to me? I mean, it doesn't seem to me like the district court was willful in ignoring your request. It seems like this was a very complicated thing, and he thought he was responding to it. Why isn't that a fair reading, that you said, you can hear these issues, and those are the issues that ended up resulting in the royalty rate and what you want to call a damages award, and they want to call a release payment? I'm not sure what the difference is. Yeah. And so I think the critical fact through all of this is that we have always said that the jury would decide first whether or not our offers were franked, that that would always be a jury question. And that is an important issue, and it's a jury question because the jury is going to decide, among other things, for common issues, for example. You're talking about Options A and B, right? Exactly. For example, Options A and B both included a release payment, quote, as compensation for past infringement, compensation for past unlicensed sales. The jury would decide if those terms were franked. If the jury decided that those terms were franked, that that release payment was reasonable, that would resolve all issues. There's nothing more for the court to do because the jury has now decided that our offers are franked. And that was the jury's function. If the jury rejected our offers and said they weren't franked, at that point we're saying the court could go back and reform the contracts or reform the offers. And then it would be up to the court to figure out what the right amount is for the release payment too, right? But remember, the key thing here is that the jury, in our view, always goes first. And that's what Beacon Theater says, and that's what Dairy Queen says. The jury decides first. And that's actually a fairly familiar phenomenon in this court where the jury would decide damages, but the court afterwards might decide what the forward-looking rate is for an ongoing royalty. I'm lost. I mean, the agreed-upon two-step process in the 2015 joint report, at least in certain respects, seems to contemplate that the court will set the fran rate. And then necessarily the court would ultimately calculate what the release payment is too while doing that. No, actually, only if the jury first decided that our offers were not franked. So if the jury decided our offers were franked, there was nothing for the court to do. And that's absolutely critical because if the jury decides our offers are franked, then we're entitled to collect the money. That's our damages for the past unlicensed sale. And the court only gets involved, the court only has authority to exercise its equitable authority if we've lost that issue before the jury. And even apart from that, when we say the court decides whether the offer, decides the fran amount, the retroactive amount, and we really preserve this quite vociferously when the court proposed going to a bench trial, any retroactive payment for compensation, any retroactive payment for past wrongs is by its terms legal relief. And we never said, court, you can decide the amount of legal relief without a jury going first. We always said, and TCL itself said, look. I guess that raises the question of what are we supposed to – how are we supposed to think about this release payment? We're talking about specific performance, about a contract term, a contractual obligation for you to meet your fran commitment. And on one hand, you could say, well, the release payment is part of that contract breach. On the other hand, I think like what you're saying, if you turn it around and look at it like this, you could say, well, that's in substance and character just like patent infringement damages. So it's kind of like both, is it? No, actually, Judge Tinn, I think you answered the question. You said, in substance, that's patent damages. And because the Supreme Court said, don't look at the form of relief. Look at its substance. And so, for example, in Great West Life, it said, almost invariably, suits, whether by judgment, injunction, or declaration to compel the defendant to pay a sum of money are suits for money damages since they seek no more than compensation for loss resulting from the defendant's breach of duty. So the Supreme Court has said that, that when you're talking about retroactive relief for a past wrong, that's almost always money damages. You don't have to believe me. TCL itself said, a release payment is simply another word for damages for past infringement. It felt like both sides were inconsistent with the statements they were making below. I mean, I can find statements from your side that say, yes, the release payment is going to be decided by the court. I mean, there's a clear statement by your side. Are you referring to the interrogatory response, Your Honor? Yes. OK, yeah. So I'm glad you asked about the interrogatory response. Because that is not, by any means, a stipulation, or a waiver, or an agreement to have the court decide. 38867. So the first thing about that is, at that time, the district court already decided we were entitled to a jury trial on whether or not the offers were fair. And the question that was being asked there wasn't who decides. The question that was asked in that interrogatory, and I apologize for flipping back and forth, but the question that was asked is, give us the amount that's required for the release payment. Tell us how you got to that amount. Give the revenues and the data that supports the amount. And so the response seems odd. It says it will be determined by the court. But by the court is a loose term that simply means it will be determined as a result of this adjudication. The district court didn't take that as a waiver of our jury trial right, that we were saying, hey, judge, you can decide the release amount on your own with no jury trial. In fact, the district court said flat out, look, this is absolutely preserved. The district court said, and I'm quoting, Erickson has requested a jury trial of all issues. The court has indicated it will proceed with a non-jury trial and has overruled Erickson's request for a jury trial of all issues, which Erickson hereby preserves. There's never been an argument that I know of that we waived our right. Was the jury trial question briefed? I mean, was there an order or anything that kind of explains the reasoning why whatever was going on here was equitable and shouldn't be regarded as something tantamount to patent infringement damages? The district court, regrettably, was very brief in its explanation. It basically said, because the claims that are left are equitable, I think I'm going to do a bench trial. But there was extensive briefing on that. In particular, Erickson said, had Erickson been the plaintiff, so he's talking about now the declaratory judgment piece, had Erickson been the plaintiff, TCL's declaratory judgment would have come to the court as a claim for patent infringement, i.e. a claim that undoubtedly confers a right to trial by Erickson. So Erickson's saying to the district court, hey, that declaratory judgment action that you're about to try, if we had been the plaintiff, it would have been a suit for patent infringement by us for damages. And that's also pretty apparent because the district court issued an injunction across the board, globally, preventing us from filing additional patent suits, including patent suits for damages. If that declaratory judgment was not about patent infringement for damages, how are we enjoining patent suits across the world and in the United States? Second, we told the district court, the nature of the remedy sought by the parties, the binding payment obligation that requires TCL to pay royalties to Erickson and to make a release payment of money for its past patent infringement, entitles Erickson to a jury trial on all asserted claims. So we pointed specifically to the release payment that was contemplated, money being paid as compensation, a reasonable royalty for past unlicensed sales, and said, that's legal relief. You, court, can't give that legal relief without a jury trial first, and you certainly can't try common issues. And I think that brings me to the third point, which is that as between the patent infringement action that we asserted and the declaratory judgment action they asserted, there are many, many common issues. Common issues that under beacon theaters and under… Setting the FRAND rate prospectively, that's equitable relief? So setting a FRAND rate would be equitable relief in the event that we found that we've decided all the jury issues against us first. And the district court could do that and exercise its equitable discretion in light of what the jury did. And that's the basic thing that controls on the Seventh Amendment. The jury goes first. It decides the common issues. So it decides, for example… Why do you have a jury right at all on FRAND rates? Well, because the FRAND rates are not…so there's no FRAND cause of action. The only way we got into court is they filed a declaratory judgment action because they knew we were going to sue them for patent infringement. And they said, we have a defense we'd like to assert. And it's federal jurisdiction here because we're anticipating being sued by Erickson. So it's based on the fact that it's a patent infringement suit, and whether it's FRAND or not is a defense to patent infringement. If this had been a pure FRAND case based upon diversity jurisdiction, for instance, would you have had a right to a jury trial on the FRAND rates? I think we still would have, and we would have for two different reasons. We couldn't say the declaratory judgment action itself necessarily anticipated a patent infringement action. It could because if the plaintiff actually pled it that way and the district court found that TCL actually pled it that way, it could still anticipate. But we would – if they didn't, if they said, look, this is just pure state law stuff, we'll come in after. Well, what if it was just only – the only thing at stake was setting the FRAND rate prospectively? So if there was only prospective relief involved, that would weaken our case somewhat. But even then – Wouldn't it weaken it all the way? Well, no, I don't think so because we actually have a suit of our own seeking retroactive relief. And when those actions are joined – Okay, without that. Without that. If there's – they sued and they said we only want to go for prospective relief only, no common issues, and we've never – and we give up our right to damages. We give up our right to retrospective relief. Because the point is to me that the claim for the release payment is your trigger for why you can have an argument that there's a legal claim here. Well, certainly that was – No, I don't – I think we would because the lesson from Lockwood is that the patentee's decision is what controls. And so if we had returned back and said, no, no, this is legal. We actually kind of want damages going backward. That would have controlled the case. But if we – My hypothetical is if you were only forward-looking. If we surrendered it, then we would look a lot more like Teagle or tech licensing. Tech licensing, yeah. Exactly, where you would affirmatively surrender and said, I give up. No retroactive relief. I'm only acting for – So then it does come down to how we should characterize the release payment. No, I don't think it does because even apart from the release payment, you have common issues across the claim for legal relief on the one hand and forward-looking injunctive relief. And when there are issues in common, what are the comparable licenses? That's something the jury would ordinarily decide. Whether our offers were franked, do they actually – The request we made for retroactive relief, is that reasonable? That's something, again, the jury would decide. And finally, TCL time and again told the district court that its action for declaratory relief anticipated a patent suit for damages. It specifically said, look, TCL's declaratory judgment action certainly would be applied as a defense to any Erickson infringement claim. A basis for limiting the damages that Erickson could see. So when they filed the declaratory judgment, they're looking at saying, Erickson is going to sue us for damages. And then that's Appendix 713. Appendix 796, the RAND obligation is litigated in terms of what damages you can seek under patent law. So damages would be limited based upon that RAND obligation. Again, the declaratory judgment action by TCL's own admission is looking to us filing a coercive relief, a coercive action for damages. Okay, so to be sure that I understand what's at risk here, there is no risk of an injunction. Isn't that right? It's entirely whose theory of damages prevails? No, Your Honor. Your Honor, I think that in the end that there were claims for retrospective relief and for prospective relief. But the lesson of Beacon Theaters is that when you have both, the legal relief goes to the jury first. And the court can't grant an injunction until common issues are resolved by the jury. And once the jury resolves those common issues, any forward-looking relief the court grants is in light of what the jury did. And there's a familiar context for this court, which is if someone brings an action for infringement seeking damages and a forward-looking royalty, the damages component goes to the jury. And then the district court, if it's going to order a forward-looking royalty as an injunctive basis, would order that amount in light of what the jury decided. You can follow up on Judge Newman's question. At no point has your side ever sought an injunction in terms of prospective relief, right? No, we can't, right? Right. Exactly. I just want to make sure that we're all on the same page here. We certainly can't seek an injunction asking them to enter a contract to give us damages or forward-looking royalties. Maybe some holdout theory or something like that. There's nothing we can do on that because the only action we have is a patent action that the district court specifically found on pages 742 to 743. The only action in Eric's inquiry is that action for patent infringement. Hypothetically, what if we were to agree with you and say, okay, when we take a closer look at this, it looks like there needed to be a jury trial because of this common issue, Beacon Theater's problem. Then what? We just vacate and remand? Yes, the court would reverse and remand. The only complication is the court could take the contrary view, which we don't think is right, which is to say, look, this didn't anticipate a patent infringement action. It was just a state law action for breach of contract to begin with, in which case there was no jurisdiction in California. If that were to occur, the court would order the dismissal of the California action. The Texas case would go back to Texas and be tried there. We think the right answer, frankly, is that this was an action that anticipated a patent suit for damages. The district court actually decided damages. This is how much you get as compensation for passing a suit. My question is, then, hypothetically, this court would issue an opinion that doesn't comment at all or rule at all on any of the plethora of Fran-related issues. Yes, that's right. And I think that actually is an important point, which is that when you have these issues, what is the amount of damages? Your sort of typical jury question, how much they get. The way this court has controlled that is by saying, these are techniques that experts can use, and this is what you put to the jury. But you don't get, typically, 150-page opinions that are sort of slicing and dicing the evidence for you to review, because that's what 12 people sitting in a room exercising common excuse in light of all the instruction and all the evidence given to them typically decide. So all those other issues, in fact, would go away in the event that the court were to decide that our jury trial right was violated. Can we get to the Fran issues now? I know you're way over your time, and I hope it's OK to explore some of these. Yes, of course. That's why we're here. OK. Thank you. Not if my Seventh Amendment argument wins, though. We'll see. Getting back to Fran, it feels like there was no actual standard industry practice in terms of what model of royalties there would be. And I'm talking pure percentages of some sale price, some percentage mixed with caps and floors, or just a straight dollar per unit. Is that fair to say, that it's actually a bit all over the place? It is something of a mix, but I think for the licenses the district court found comparable, the one thing is that every one of the negotiated licenses has either a dollars per unit piece of it, or it has lump sum cash payments. Not one of the negotiated licenses was actually a pure percentage of price royalty. But there's a pretty established history of percentage-based royalties. Isn't that fair to say? Yeah. In fact, the developers of the standard came out of the box touting and promoting a pure percentage. And I gather that's what you're relying on, is the history for these patents. Is that right? I think that it's correct that courts and entities that enter these licenses will use pure percentage prices. But when they do that, they've just chosen a percentage that reflects what the contribution is of the actual licensed technology. It's not just a raw percentage. For example, if you had a certain percentage for a cheap flip phone, or as in Vernetics, you had for VoIP phones that weren't particularly sophisticated. You wouldn't take that raw percentage and just transfer it across to a very fancy iPhone, which has a lot of value in it that may not be traceable to the technology. You would actually have to say, okay, what are the differences across these? But in the statements made by you and others that came up ultimately with the standard, say, 10 years ago, I didn't see the pronouncements couched in the way you're saying it. It felt much more just very simple, clean, straight, pure percentage. This is what we're gunning for. Here's the total aggregate royalty rate we have in mind that we think we're entitled to. Maybe you were being a little greedy. Who knows? But it would certainly be strange to 10 years later say, oh, the total aggregate rate actually should be double that. Well, and actually, we haven't challenged the district court's use of a total aggregate. But if we're going to look at what we said our rate should be, we were saying at the time it was in the range of 1.5%. Based on a belief that you owned up to 25% of all the patents that made up the standard. No, actually, I think I should clarify that because if I could get the court to turn to page 70. I love these numbers. 72,130 of the joint appendix. Which volume? It's volume five. This is actually the 2006 submission by Eric to Etsy explaining what it means when it's talking about what the contribution credit should be. And what page number again? 72,130. And it says, we're talking about proportionality. And it says, this is simply not a numerical equation, but the compensation must, within reasonable bounds, reflect. Where on the page? The very top of the page. First full sentence. Second full sentence. This is not simply a numerical equation, but the compensation must, within reasonable bounds, reflect the contribution. And then if you go down to the next one, two paragraphs down, about midway through, it says, this is not merely patent counting, but also reflects the contribution which the respective patents make. That's exactly what this court emphasized and this court said in Erickson versus Dehling. The fundamental, the essential element of any reasonable royalty is that it reflects the incremental value added by the patent. And that was the fundamental mistake. For that reason, both parties said, let's look at the value the patents add. And the fundamental mistake the district court made is it said, I'm going to instead use a pure patent counting methodology. A simple patent counting methodology was his language. My understanding is the judge relied on this, I don't know whether to call it a finding or an assumption, that all of Erickson's SEP patents would, on average, have an average value compared to all the other patents in the standard. And that was, in his view, a ruling that was favorable to Erickson because, in his view, there was sufficient evidence in the record that suggests that Erickson's patents, on average, were valued at below average in terms of whatever technical contribution they had to the standard. Judge Chen, I actually think that's exactly backwards. But isn't that what he found? No. It's not what he found. The closest he came to finding what Erickson's value was compared to others was a statement that said, Erickson's patent portfolio is certainly not as strong or essential as it has claimed. So it doubted our figure that it was $6.15 per two particular pieces or $23 and change for the whole thing. So he doubted it was as essential as we claimed. But there was no evidence and no finding that our patents were actually average. And I think it's critical because the district court looked at TCL's evidence on this. And there were two methodologies. Well, I mean, he didn't point to specific evidence. But he rejected your evidence, your expert, that these are really high-value patents. He rejected their expert, that this is really low-value patents, and said, I'm just going to assume they're average. There may be a problem with the evidentiary basis for that. But it's pretty clear he thought that both of your experts' models were wrong in some sense. Well, there's two things that come out of that. First, if an expert, for example, made his report saying, you know what? This method of evaluation doesn't work. That method of evaluation is going to work. So I'm going to just assume everybody's average and just do a mathematical equation. I think this court would say, that's an abuse of discretion to allow that expert to testify. Just assume that they're all average in the absence of any evidence that supports it. It doesn't get any better when the district court makes that its rationale for the result. But the second piece of it is, look, there are burdens of proof here. And the district court said, and nobody disputes that TCL had the burden of proving our rates are not friend. If it did not come forward with an actual fact. So is your objection to this top-down methodology that, that there's no evidentiary foundation for it, rather than the methodology as a whole? Because it seems to me that if the expert, their expert, if he had agreed with their expert in their survey of the patents and said these are low-value patents, they actually looked at patents. They compared them to the portfolio and things like that. Then that would provide an evidentiary basis for this top-down methodology. I know you don't like it, but I'm just trying to push out whether it's, because I do see that there's a little bit of a problem in that he assumed the middle without any evidence supporting it. But if there had been evidence supporting this top-down methodology, is it a viable method? Yeah, I think Erickson's view has always been, and I'll say it here, especially when you have no prior licenses or especially when you have evidence that there is a problem with stacking, it can be very useful. And we would never say it's just prohibited off of, you know, not allowed to be used. But the one thing is to be consistent with this court's precedence and to be consistent with the general rule that you have to reward the inventor for his contribution to the invention or to the devices, is that you have to look at the value of the patents. And the district court simply didn't do that. If the district court thought TCL failed in its burden of coming up with a method of valuing the patents and it thought that we did also, the answer would have been to enter judgment for Erickson because they failed in their burden to show that our patents and our offers were not franked. They just didn't come forward with a plausible methodology. The court can't do what it can't do. Then what would happen? Pardon? I guess I'm just wondering what would happen. You're still not getting paid under that scenario. That's right. If they fail to prove that our patents are not franked, at that point we can demand to be paid our royalty and we would have to pursue our infringement actions.  I'm just going to use simple patent counting because I don't have evidence of value. If you don't have evidence of value, that means that TCL, which had the burden of proving our offers not franked, has to lose. If there's no other questions, I'll reserve the negative time I have left for rebuttal. Thank you. Okay. Thank you. Thank you, Mr. Kornisky. And if you would, I think it would be clear as trust. Let's start with the second issue of the valuation. Sure. So with the second issue addressing Judge Chen's question with regard to whether there was a standard way of doing this, no, this is the first time I think a court has looked at, you know, how do you set up a license for an entire portfolio of patents? What the court did is look back at what was a historical practice that Erickson, how Erickson had formatted its licenses. The idea that somehow there should have been floors and caps, what the evidence showed, number one, was there was no evidence that Erickson's patents had any set or minimum value, number one. Number two. Well, the evidence were the license fees that are already being paid. Isn't that right? That's correct. The licensees were paying. I think the argument that counsel was making was that somehow it should have been a set, there should have been a floor or a cap or something like that. But the evidence was that that was optional. It was something that Erickson decided to put in after it closed its handset business. And the idea was if a licensee came and asked for a cap, then Erickson would throw in the request for a floor. And that floor varied. In addition, any time that – oh, sorry. In that position, it changed in discovery. I guess here's a basic question I have in terms of understanding how to value these SEP patents of the standard. You know, we have pretty well-developed – I mean, it could be more developed law on patent damages. And what we tend to focus on is what is the incremental value of the technical contribution of this patented technology. And we try to hit some kind of economic valuation of that technical contribution. And so that does seem like some kind of fixed value. And so if you have some patented technology on a muffler, then whether you're Porsche or you're Kia, you're probably going to pay the same amount for that patented technology on that muffler. It's not going to fluctuate based on the price of the car. And so that's one thing that makes me wonder about the pure percentage assessment of what the royalty is going to be when you have great disparity in sale price of the different kinds of phones here. And so why is it reasonable if one company is paying a quarter and another company is paying $4 for the exact same thing? I don't think it is reasonable if they're paying a fixed price for the exact same thing. In fact, it creates a problem. Well, my question is the other way. Why is it reasonable or fair for two different companies to be paying very, very different prices for the exact same patented technology? Again, it depends. If they're paying different prices, it depends upon what value those patents are bringing to the product. The reason that the top-down analysis is so appropriate here is… But, I mean, to put it simply, isn't the question really if you're applying a pure royalty rate, Apple's going to pay $8 per phone because their phones cost more, and you're going to pay $2 a phone because your phones cost less? And why is that fair? Because you're buying the same exact patent portfolio. No, but the value… So the friend rate is… Let's just start with the assumption that the patents are worth the same. The patent is worth something intrinsically. The added value a patent provides… In the non-SEP world, in the non-friend world, I think, generally, if you get a patent and you get damages, it's the same damage for different companies. Here, why shouldn't that be true here as well? We're not looking at damages. What we're looking at is… I know we're not looking at damages, but the question is, why shouldn't we be applying a flat dollar fee versus a royalty rate that varies based upon the price of the phone? Because then you have the other problem where you've got a device that is less expensive, will be paying… Well, because in this situation, we have licenses which have percentage rates. And so if you have some of the folks, some of your competitors are paying percentage rates, and you get a fixed fee, then you end up in a discriminatory position because… I think we used Huawei as an example. Why, if the minimum value of the patent is $2 per unit, and some of your competitors, because they make a lot of money, because they sell expensive phones, may want to pay a premium to avoid litigation or whatever, they can do that, but if the minimum is $2, why shouldn't they be allowed to be a floor? Because there are two requirements to friend rate. Number one, it has to be fair and reasonable, and it has to be non-discriminatory. Why is it non-discriminatory to set a floor? Or not non-discriminatory? Because there are a number of… If you set a floor for some, and you have no floors for others, then you're discriminating against the folks who have the floor. Why? If the patent is worth $2, and everybody that licenses this, no matter what the terms of the license, does pay at least $2, why is it non-discriminatory that some companies may, on a pure royalty rate percentage, agree to pay more than $2? I mean, it's certainly not discriminating against you, because you're paying the lowest actual dollar rate. They're paying higher. The test for FRAND is to look at what is the value that's added to the product over other alternatives prior to the establishment of the standard. Why doesn't that lead to a notion that the incremental value has a fixed dollar amount, rather than a fixed rate amount? A number of reasons. For example, prices in technology are always going down. You pick any industry, you'll find that prices will go down. If you have a fixed fee for a phone that may have cost $400, and then all of a sudden the phone is now signed for $100, that fixed fee no longer applies. Is there something to the fact that this acronym FRAND, it's calling for something that's fair, calling for something that's reasonable, calling for something that's non-discriminatory, and if all those things are separate thoughts, then maybe we're not supposed to use customary, traditional patent damages analysis when it comes to setting royalty rates for these kinds of standard essential patents. There's other considerations that have to go into the mix. I would absolutely agree with that. I guess I missed the point. But I wouldn't even know how to begin to articulate what's the right way to think about those questions. And I think that's what Judge Selma was wrestling with. And what he had to do was look at the evidence. And in this particular case, what the evidence pointed to was that one way to look at the FRAND rate was using a top-down analysis. But your theory is really essentially denying, pulling the rug out of the basic principles of the entire structure of the sharing, the knowledge of an entitlement on non-discriminatory terms compared with the others. On your theory, every license would have to be separately negotiated, litigated. And isn't that exactly what this system is designed to avoid, to provide confidence, that you know that you have an entitlement, no worse than anyone else's? What we have here is a situation where Erickson had proposed a rate for 3G and 4G. And that rate was to apply to all phones similarly. And so that would have been consistent if Erickson had treated it that way. But what we saw, number one, on the fair and reasonable side, that the representation they had made to the industry, that they had 25% of all LTE, was completely false. What they had was somewhere between 4.7% and 7.5%. What we saw from the comparable license analysis was not that everybody was paying the same reference price, but that there were a number of folks who had sweetheart deals. And the folks who got the sweetheart deals were the ones with more resources who could litigate, who could analyze their portfolio, who could basically resist a holdup. The vast majority of licensees in this case took the rates that Erickson was proposing, say 2%. When you look at the companies like Samsung and Apple and Huawei, they got rates that were 10 times, maybe more, less, because they actually looked at the portfolios and attempted to figure out what was a fair and reasonable rate. Were they less in terms of percentage value or less in terms of dollar value? They were less in terms of percentage value. Some were less in terms of dollar value. But some weren't. Correct. And so the dollar value was all over the place too. So if you had converted the rates that were being paid and you converted it to a dollar... I mean, if it can give Apple a smaller royalty rate and still get more actual dollars, they're out ahead. Well, they may be out ahead. But if you allow the biggest players in the industry, like Apple and Samsung, for example, to get the best rates because they say, we're going to structure it on a lump sum basis. And then what happens is the competitors, your smaller players, are never able to compete. And what the standard was supposed to do was protect those small and medium-sized players. But the game that's being played by Ericsson doesn't allow that because what they did is they modified the... So you're either asking for a privilege rate or you're asking that all the rates should come down to the lowest common denominator and that even Apple and Samsung, selling their $800 phones, should have to pay a trivial amount too. I shouldn't use the word trivial. A smaller amount. I don't know why... No, Your Honor, I'm not saying it's a trivial or small amount. I'm saying how do you calculate the frame rate? But your view is, it seems to me you're saying, we're a small player. We sell cheaper phones for the most part. It's unfair to make us pay a flat fee that will result in a higher percentage than Apple's paying. But if Apple's paying a higher dollar amount, Ericsson's still getting more. So if you all pay the same small percentage because you want to pay a smaller amount, then Apple's going to end up paying smaller too. Yeah, first the premise is wrong because Ericsson argues that we only sell inexpensive phones. We actually sell high-end phones that compete with Apple. We sell high-end phones that compete with Samsung. We have mid-level phones and we have... And then Apple is moving downwards with less expensive phones. So what Ericsson had represented to the industry is that we would apply this rate to the end product. And that's the way they structured their licenses. So in this case, when you look at how do you figure out what's fair and reasonable and how do you figure out what's discriminatory, we looked at the evidence that was presented in this case. And the way Ericsson had structured its licenses is that they varied. And they would create these business cases where they would, for example, they'd take a lump sum and they would project sales being very small. And so it looked like what they were paying was going up, the rates were up. In reality, the number of sales that a company like Apple or Samsung was making was significantly more. And all they were paying was a very low rate as we see in the record. But right now, I mean, the record is mixed on the types of licenses they were issuing. Correct. It's not all pure percentage. What the court had to do in this case was establish a way to do an apples-to-apples comparison. What you can't do is switch back and forth between a dollar per unit and then a percentage rate. You have a race to the bottom. And so what the court did was look at the historical practice that Ericsson was making and how it was licensing its devices or licensing its patents. And then modified all of the, unpacked all of the licenses so that we had an apples-to-apples comparison. So all of the questions that you're pointing out to us are traditional questions of fact. Are they not? What's right? What's fair? What's to be balanced? How should this system work? Doesn't that all weigh on the side of the jury entitlement? No, Your Honor, because if you look at whether there are factual issues and whether you have an equitable determination or a legal determination, you still have factual issues. Where is the equitable claim? Damages are one of the primary aspects, as far as I can tell from my reading, that juries are entitled primarily, that are primarily jury questions. Every question of fact has an equitable foundation of what's right and what's wrong, what's fair and what isn't. So that doesn't remove it from being a question of fact, does it? So there were no damages awarded in this case. That moves us back to the jury trial issue. The release payment in this case was not damages. It was one of many terms in the license to be determined by the court. You're saying not damages? What else do you have, an injunction? What we were seeking in this case was a declaratory judgment of specific performance that Erickson had not complied with its legal obligation under its Etsy contract. And then specific performance with the court creating a FRAND license. Specific performance and the FRAND license is issued in the form of an injunction. Specific performance and the issuance of an injunction are equitable determinations. And you're saying that retrospective relief was part of that overall FRAND license? Yes, in the sense that what the court did was form this license, this FRAND license. It then figured out the forward-looking royalty for the license. It then took an accounting and applied the forward-looking rate backwards. When you have a payment of money... And all of that was inside an order styled as an injunction. Correct. And so, therefore, everything got rolled up into what you would call equitable relief. Exactly, Your Honor. I think, number one, determining what Erickson's rights were or whether Erickson had complied with his obligations and then having them perform specific performance or having them issue a FRAND license is equitable. Having the court forming a license is equitable. A jury does not pick and choose what terms will go into a contract or a license. Here, that release payment was ancillary to the injunction that the court was issuing. It wasn't the payment... It all depends on how you look at it. Because, as I was suggesting earlier with the opposing counsel, the substance of it looks a lot like patent infringement damages. In fact, that's expressly why the district court mooted the pending state patent infringement action. It's because of this release payment. And so, that makes me think that everybody understands that these terms, release payment, infringement damages, are really interchangeable. They're the same thing. There isn't any daylight between the two. Yeah, they're not the same thing, Your Honor. So, why is that? The reason they're not the same thing is because there was no legal claim tried. There were no patent infringements tried in this case. Why? Because Erickson chose to stay those patent infringement claims. This was not a situation I think you would ask if they had waived their right. I wouldn't say they waived it. They chose not to pursue their patent infringement claims. in order to focus on a different framework. And the framework they wanted was for a determination as to whether or not they had complied with their FRAND obligations. Were options A or B FRAND? If it turned out that they were, Erickson wanted that imposed on TCL. If it turned out that they weren't FRAND, then the court was to come in and either rewrite the license or modify the license. But your FRAND said that the beginning point for that is that they wanted that initial determination of whether A or B were FRAND to be determined by a jury. But that determination was based on a declaratory judgment claim as to whether or not they had performed. But the only reason you had jurisdiction in California for your declaratory judgment claim is because of the mirror patent infringement claim. Right? But that just... You didn't have jurisdiction otherwise. Isn't that correct? No, that's not true. You didn't have diversity jurisdiction, right? We had the same claims that were brought into California action were brought into Texas action. The Texas court transferred the Texas action to California. Judge Selma didn't do anything about that. There was no dispute that there was subject matter jurisdiction with respect to the Texas court. And those claims, those declaratory judgment claims, were tried. So to the extent there's an argument that there's no jurisdiction... The Texas action started out as an infringement action, did it not? No. There were infringement claims, and those were stayed. That there were DJ claims, and those were tried. So I think you're conflating... Maybe I'm a little confused. This is a very confusing procedural case. The declaratory judgment action you filed in California, you're saying that that wasn't the declaratory judgment action that was ultimately tried? I am saying that it was tried. So what I'm saying is that that same DJ action was brought in Texas. That declaratory judgment action, to the extent it had jurisdiction, had to be based on patent infringement as a counterclaim, did it not? It's not a diversity case, right? Correct. So the only federal question is patent infringement. So patent infringement was part of this case as a counterclaim. But that doesn't make it an inverted action. The argument that Erickson is trying to make is that it was a patent claim. It wasn't a patent claim. Number one, because the patent claims were stayed. But number two, what we were asking for was specific performance and information content. Can you stop talking over me, please? The basis for the jurisdiction was that there was a patent claim. No, there was a hypothetical coercive claim that could have been brought against us. Which was a patent infringement claim. Correct. Okay, but that doesn't decide jurisdiction. As we know from Lockwood, if you have- So if patent infringement wasn't the basis for jurisdiction, what was the basis for jurisdiction? I'm sorry. I'm sorry. It doesn't define whether or not there was a right to a jury trial or not. If there's a patent infringement claim, you could be pursuing- No, I think you answered Judge Hughes' question. What was the basis for jurisdiction? I'm sorry. You're correct. It was based on DJ jurisdiction. The anticipation of a hypothetical patent infringement claim. My point was, I'm sorry, was that whether or not there was this hypothetical patent claim wouldn't be decisive of whether there was a right to a jury trial. Because patent owners can pursue only their equitable remedies. We know from Lockwood and in re-technology licensing. So that's not established. Okay, I think we're ready to move on. Are we? Sorry, I have a couple more questions. Oh, okay. I guess we are. Proceed. Maybe more than a couple, but I'll try to keep it short. First of all, the amended final judgment, doesn't it characterize the release payment as release for claims for past patent infringement? No, Your Honor. As a matter of fact, maybe I could address that. I think in Erickson's brief, page 15, they refer to appendix 56038, where the court talks about patent infringement action. But that language was put into... I guess I'm looking at JA 14. I'm sorry, could you repeat that again? A14. The first sentence under the heading release. Okay. Yes, I see the language. Yeah, this shall release TCL and all customers of TCL who have purchased or used products herein licensed to TCL for claims for past patent infringement. Yeah, what the court was referring to there were past unlicensed sales. Right. I.e. past patent infringement. Yes, but I think what the court is referring to here is the release payment, which was calculated based upon a forward looking royalty. The release payment was a term that he had included in the contract which was ancillary to the injunction. And so, you know, based upon the Taos case, that would be equitable. My last question is really getting back to this simple patent counting approach that the district court took. And it made a ruling that it was going to assign an average value to all of Erickson's patent families in terms of their relative contribution compared to all the other patent families in the standard. And to me, I couldn't see the analysis in the opinion anywhere for what justified that understanding, finding, whatever you want to call it. It appeared to be him relying on TCL's experts analysis, which he had just discredited as being incomplete and insufficient or trying to place values on Erickson patents in a vacuum without actually doing a sufficient meaningful comparison of Erickson's patents against all the other patents in the standard. So right now, I can't see into this opinion what the justification is for assigning average value to all of Erickson's SEP patents. So two points there. Number one, the statement that the court made about the patent counting, it followed and was made after the court's assessment and review of evidence that TCL had presented as to the contribution and importance of every single one of Erickson's standard essential patents. And so the court said that he relied on that analysis to determine that Erickson's patent was neither strong or as essential as it had claimed. Right, but at A66-67, he itemizes all these fatal flaws of that importance and contribution analysis. And then he ultimately uses it. That's why I'm completely lost. Well, two things. Number one, he didn't use the quantitative adjustments. He accepted the notion that there was no evidence of any above average patents. That was number one. What Erickson failed to do was to present evidence to say, look, these particular patents increase the value of our portfolio. And that's something that licensees do and licensors do in every license negotiation. So again, based upon the evidence that was presented to the court or the lack of evidence coming from Erickson, the court determined that it was going to use a one-to-one count. But keep in mind, I think the court would have been just as justified to apply a less than one-to-one count based upon the evidence that TCL had presented. But when you think about a portfolio that has hundreds of patents, I mean, in reality, I think you're looking at, you know, some may be more valuable than others. Some may be minor improvements. I think it is reasonable to assume that you can do a one-to-one analysis when all you're trying to do is get data points. The court didn't say, hey, I'm going to use this, and this is how I came up with the friend rate. What the court did is take data points based upon the evidence that was available to it. It then took data points from the comparable license analysis based upon the data that was available to it. And the court said the fact that I have two different approaches from two different parties, and my assessment of them results in rates that are so similar convinces him that he found a friend rate. So I think on this record, you know, there is no evidence that it was any kind of clear error or that the court abused its discretion. The parties came to him and said, we want a worldwide license. Both of us do. We want this dispute resolved worldwide. We want a friend license. Please create it for us. We haven't been able to do this for four years. So that's what the court did, based upon a tremendous amount of evidence. Has there been any discussions of binding arbitration between you parties? I think we've had every kind of discussion, Your Honor. And this was the only time. Here's the problem with these cases is these licenses are not just legal negotiations. They're commercial business negotiations that don't necessarily conform with one set of standards. So when you're asking the courts to step in, you're asking us to provide what is a legal framework  I think that's an accurate statement, Your Honor. Here, the parties just weren't able to reach that determination. And we see that it's a huge problem in the industry, the cell phone industry, the automotive industry. And there is a relatively small amount of precedent out there as to what the parties should and shouldn't be doing. So again, Judge Selma looked at, what was the evidence presented to him? What were the parties asking him to do? How did we handle this in the past? What did Erickson say was the prevalent way to analyze FRAND? And it was using the top-down analysis. But the court recognized that that might only get you halfway there because you'd have to decide the discrimination prompt. And so he also looked at the comparable license analysis. Okay. Good. Thank you. Thank you, Your Honor. Mr. Lampkin, you have five minutes of rebuttal that was originally scheduled. Thank you. I'd like to begin by answering one of Judge Chen's questions, which is whether FRAND is completely unique in terms of the nature of the royalty. But if FRAND royalty is still a royalty, and Erickson v. D-Link, which articulated the essential requirement that it be based on the incremental value that the patented invention adds to the product. That was a RAND case. It didn't have the F in FRAND, but it had reasonable and non-discriminatory. And so that requirement extends across all royalties, whether you call them FRAND, RAND, or simply damages royalty. It has to be based on the incremental addition and the incremental value added to the patent. And that was just the one thing the district court left out here. The district court just assumed that all patents are equal and they're all of equal value. After having rejected, the parties... But just so I understand your position, you're not suggesting that pure percentage rates is, as a matter of law, unacceptable? No, I think courts can actually do pure percentage rates correctly. But there's two things you have to make sure you do. First, you have to be careful to exclude value that isn't added by the technology. So if you're looking at the rate on an iPhone, you don't assume that the rate incorporates Apple's brand value. You're going to have to scale it down and take that percentage into account. Or conversely, when you do it on a flip phone, you don't assume the same percentage rate applies to a really expensive... But what if, hypothetically, there are pure percentage licenses out there that are just based on the retail price and don't make any attempts to, you know, excise out brand value or anything else? And I think that those are actually, for Erickson, extraordinarily rare. Since 2011 on, we and our rate chart is actually on page 53, 964, and 965. Our rate chart has included floors and caps. And the reason for that is there's a certain minimum that we're contributing, whether it's a flip phone or an iPhone. But past a certain point, this is the cap, past a certain point, the iPhone has brand value, it has a jewel-encrusted case, whatever it is, we're not contributing to that, and so we're not claiming our royalty on that. And it's just not unreasonable or discriminatory to use these sorts of floors and caps to say, look, you know, just because your phone is, you know, $30 doesn't mean you pay only a penny, when Apple would pay many, many times that because it has a really expensive phone. And I think that was the fundamental error that the court made here, is it thought it was discriminatory for people to pay different percentage rates for very different phones. In fact, it did the opposite of what you're supposed to do. When the district court looked for comparable phones, it excluded all of the low-end phones that were similar to TCLs, and I know the record says 57% of TCL phones are sort of flip phones, not even smartphones. But it excluded all those, Doro, Carbon, ZTE, those got excluded. Instead, the district court looked only at the percentages for the high-end phones, like Apple, or Korea's flagships, which is Samsung and LG, or Taiwan's flagship, which is HTC, and ignored all the low-end phones. So if you're going to do a pure percentage, you have to either make sure that you're really comparable on your phones, which the district court didn't do, or you have to make some effort to exclude value that the parties, like Ericsson, aren't claiming royalty on because it comes from, for example, brand value. If I could just address very quickly the notion that there's somehow a sweetheart deal for other people here in discrimination in that respect. One of the questions that was asked on cross-examination is, and this is on page 52,000... The district court didn't make a finding on this, right? Well, the district court didn't make a finding on sweetheart deals, and it couldn't because there was a question asked, which was, look, if I offered you the deal Apple has, but scaled down to your lower value and your lower volume, would you accept it? And the answer was, no, because they lumped some payment they didn't want to make. They want a smaller payment because it's a cheaper phone. And that simply isn't discrimination. That's asking for discrimination in favor of TCL. If I can turn back briefly to the Seventh Amendment, I think Judge Hughes, you hit it right on the head, which is, if the first case in California hadn't actually been a patent infringement action, anticipating one, there would have been no jurisdiction. And if you focus only on the Texas action, part of which was tried, so that would have to be dismissed. But if you focused on the Texas action, that just underscores the Seventh Amendment violation because that was brought as an action for infringement for damages. What the district court did is it said, I will try to myself, not to a jury, a defense first, the Fran defense, and then I will eliminate your right to a jury trial based on the findings I've made. That's exactly what, under Lockwood, and Beacon Theaters, and Dairy Queen, a court can't do on the Seventh Amendment. If we had brought our infringement action suit first, we would have been entitled to a jury trial on all common issues. It can't go away simply because TCL filed a declaratory judgment action in California first. If there are no questions, I thank the court for its time. Thank you. Thank you both. The case is taken under submission.